May it please the Court, I am Burley for Appellant Peter James Holler. Counsel, I just said at the outset this case has a number of issues, and when the clerk's office allocates time, they really do it by looking at the number of issues. But it doesn't really seem that this requires a full argument, 20 minutes, which is a maximum argument. I think you should be able to deal with the real issues you need to discuss an oral argument in a shorter period than that. So don't feel you have to use your full argument time just because the clerk's office gave you the maximum. I was concerned about not having enough to say rather than. No, don't be concerned about that. You know, you do have briefs. We have read the briefs and your brief is quite thick and we've read it all. And, you know, you ought to concentrate in your argument on the points you think are really likely, in your view, to obtain a reversal. Okay. Well, the point I would like to start with is the outrageous government conduct. How many cases has there been, to your knowledge, in which a court has reversed on the basis of outrageous government conduct? I don't know the answer to that, Your Honor. I believe I cited something in the briefs. I know there are a number where they did not. Yeah. Oh, there are lots of cases where people have argued outrageous government conduct. And, you know, in my opinion, pretty outrageous conduct. Yes. And they haven't been reversed. I don't know what to say in response to that. What I'm saying is I think I've seen two cases in the history of the country that have been reversed on the basis of outrageous conduct, which means it's an extremely high standard, which is almost never met. Well, I would say this. I wouldn't put a lot of hope in that argument. I would say this. Certainly at the trial level, I know personally of several cases where the case was dismissed based on that. So it does happen. It just apparently doesn't happen very often on appeal. Maybe the trial courts take care of it. Excuse me? Maybe the trial courts take care of it. Well, that could be. That could be. But in this case, we have a situation where the informant clearly had a criminal past, four reprimands in the past. But don't all informants have a criminal past? I mean, I haven't seen a C.I. case where there isn't some nefarious past with the C.I. Absolutely. But I think the issue is that the government has to keep control of these guys. And this guy was based on the record, based on. Outrageous government conduct is generally where the government has created the entire crime out of whole cloth. It's more than entrapment. It's the government, for instance, where they've set up a bootlegging operation which didn't exist to start with. What's the case that you have that would make you think that using an unreliable, corrupt witness would constitute outrageous government conduct? In this case, it's more than that. I mean, he went to the government. He went to his case agent, said he had this source named Uriah who never or Uriah who never materialized. And there's some real question whether this individual even exists. He said the drug deal was going to go down in New York. Was this in order to obtain the drugs? In order to obtain the drugs. And then the drug deal was set up and Mr. Haller, you know, met with the Riverside undercover officer and tested the cocaine. I can't argue entrapment with any kind of a straight face, obviously. But it seems pretty outrageous to me that the money, the drugs were obtained based on some somewhat false statement as to who was, where the target was. It also seems to me that if you look at Mr. Palazzi of the co-defendant's plea agreement, that there was at least $220,000 that they were counting on the bed. And by the time Mr. Ferretti delivered the money to the government, there was $179,000. And in the brief, I picked apart several scenarios of what might have happened. So he took a lot of, potentially a lot of money and certainly some money. And, you know, the only thing I can say to your question, Your Honor, is that obviously the case law in this circuit and elsewhere seems to be based on the assumption that the end justifies the means, that at some point, you know, that we need these bad guys to get the other bad guys and, therefore, what we're doing is justified as long as we infiltrate and we catch big drug dealers. What my concern is, and I don't mean to be. I think you've captured the state of the law. I think it's correct. I mean, I don't like it. Personally, I don't like it. But that's what it is, right? That is what it is. But at some point, don't we violate the defendant's due process rights when we have someone who is so, an informant who is so far afield that he's dealing on the side, which is probably happening here. And he is, you know, he's a criminal himself. It seems a pretty egregious case to me. I can't argue that there aren't other cases that are worse. But I think it's of concern. I also think it's of concern that the defense wasn't able to get a hold of his IRS records to verify how much money he'd stolen. I think if the jury was out two days, and I think if the jury had seen that, it might have gone the other way. I think that infringed his right to present a defense. Was that the government's fault, though? It seemed to me it was maybe a mistake by the clerk of the court. That was something that the government argued. I would just say that, you know, there was an order. The IRS had the order, and the order, it didn't come through. They didn't produce it. I think that probably the IRS had the order, though. Yeah, oh, yeah. There was an order. The court ordered it. But did it get to the IRS timely? That is what they said, so I don't know. The record's a little vague, excuse me, a little vague on that. But let's assume that it should have been produced, which I think is a fair assumption. This is something, if the jury had known about, they may have gone the other way. They were out two days. You know, what was there to be out about? They had to be disturbed about Mr. Ferretti's credibility. I can't tell you for sure, but it seems very likely. What should we do about the Blakeley issue? I was going to ask the Court what the Court wants to do about the Blakeley issue. I have heard through the grapevine that we're going to be getting a decision before the end of the year from the Supreme Court, we hope. Like everybody else in my office, we've got 20 cases lined up waiting to go. We don't know. Clearly, the jury's finding would require a reduction and a resentencing. It seems to me if the Court is not inclined to reverse, then it needs to be remanded. How long is the sentence in this case? 250 months. And I believe the sentencing range, if he's resentenced, would be the jury found 5 kilograms. So it would be 135 to 168 months, which is substantial. He still has a lot of time to do it, but it's a substantial reduction. This isn't a case like Castro or Fernandez where, you know, he needs immediate release. I actually have a case like that where we're waiting, but certainly we could use some guidance about what to do. And I don't know what this Court is going to do. I was in oral argument. My former law partner argued the Fernandez case in August. And Judge Fletcher indicated that they were holding all their likely cases or most of them until they heard on Booker and Fanfan. So I don't know. Is the Court at liberty to say what it thinks it wants to do or? Well, it wouldn't seem to do any harm to hold your client's case. No. It's going to be there anyway. Right. The issue really comes up when there's a case where the person may be entitled to release his sentences about. He served the time that he would serve. And if the court throughout the guidelines has said that the jury had to decide, then some of those we've been remanding to the district court to let the district court resolve. But in a case like this, there's no rush. No, unfortunately for my client, there isn't. The other issue that I thought was important to address was the jurisdiction issue. I think I was pretty thoroughly brief, but I just want to reiterate that there's no case where the government actually supplied. All the cases you said that it seemed to me were cases where the act took place outside of the United States. And the court said, well, you have to show that there is going to be a distribution in the United States since the act of the acts that actually occurred, occurred outside. Here we have the acts that actually occurred, occurred in the United States. Yes, we did. But the. But do you have any case that says that? No, I don't. The closest I have is Hayes, which is the case where they were on the high seas. The defendants were on the high seas and the marijuana was destined to be distributed in Key West. But the prong of the elements of the crime that we were concerned about here was the intent to distribute within the United States. And there is no case, I found no case that said, that addresses the issue of what do you do when you have government-supplied cocaine? The defendant never takes possession and he never intended to distribute in the United States. And there were several cases we cited also that talked about the fact that the distribution in the United States was what was used to prove intent. I think that was, yes, United States v. Larson said, cited Hayes and said, there's jurisdiction under 841A1 provided that distribution was clearly intended within the territorial U.S. So that's the law on that one. I don't think there's actually ever been anything with quite this set of facts. And it would be an interesting issue, I think, for the Court to look at further. Does the Court have any other questions?  Thank you, counsel. Good morning, Your Honor. May it please the Court, Tom O'Brien and Elizabeth Fishman for the government. With the Court's permission, I would like to address the issues of outrageous government conduct as well as the 404B issue, and Ms. Fishman will address any remaining issues for the Court. Well, counsel did not raise the 404B argument in her argument, and you fairly briefed it. So is there really any reason to respond now? Not unless the Court has any particular questions on that issue. Thank you. Thank you, Your Honor. Regarding the outrageous government conduct, the Court is aware the indictment is to be dismissed where the conduct is so grossly shocking and outrageous as to violate the universal sense of justice. In this particular case, the defense is making essentially a two-prong argument focused on the conduct of the confidential informant, Mr. Ferretti. One is Mr. Ferretti's past conduct not related to this particular case, and the other is the allegations that Mr. Ferretti stole money in this particular case. The government's position is, first of all, the history of the confidential informant has been thoroughly briefed, excuse me, to the Court. But except for the fact that Mr. Ferretti admitted prior to the Court case here that he had not paid his income taxes, the other particular allegations have to do with violations of DEA administrative policy, not violations of the law. And we offer it does not rise to the level of such outrageous government conduct that would justify dismissal of the indictment. Suppose he was somebody who was regularly entering into these deals with the government and stealing the money. Would that – and you continued to use, you know, a person to set up these deals who was in it not just for the normal compensation the government pays, but because he would steal the drug money regularly. Would that meet the standard of outrageous government conduct, continuing to use that kind of an informant? No, Your Honor. Although that type of conduct would certainly be sufficient to be condemned, and it would be something that I would hope the government, if it became aware of that type of series of alleged misconduct in the past, actually stealing drug money and it was proven up, that would be the type of informant that should no longer be working for the Federal Government. However, there are cases, the Simpson case, I believe, Simpson 1, that discusses a passive tolerance. There's a somewhat of a more open approach to a confidential informant, essentially an unsavory person, perhaps, as confidential informants tend to be, working and violating the law versus a paid badge-carrying, gun-carrying Federal agent. Regarding the theft allegations, Your Honor, I would offer that the conduct that the defense attacks in the instant case was never proven. There are allegations that were made by a co-defendant, Mr. Palacio. Mr. Palacio offered conflicting versions of how much money there was and how much money was taken by himself. The defense opted not to call Mr. Palacio to testify at trial. They did write him down and opted to send him back. There was also allegations by what is referred to as a blackballed confidential informant, a blackballed CI. He was found to be not credible by the DEA, and that defense opted also not to call him to testify. And lastly, the person, I suppose, who could have really established how much money there was out there was a defendant. The defendant opted not only not to submit a sworn declaration to support his allegations of theft, he also opted not to testify either at the pretrial hearings or at the trial itself. Does the Court have to? Yes, ma'am. Do you agree that in this case it probably would be preferable to await the Supreme Court decision? We do, Your Honor, regarding the sentencing. Before, yeah, regarding the sentencing. Yes, Your Honor. I would add also that the district court did find under 851 the defendant had suffered a prior conspiracy, I believe it was a conspiracy to possess marijuana, in 1987. So therefore, the defendant was eligible for the 20-year mandatory minimum. So regardless of, I believe, the holding of the Supreme Court or pending holding of the Supreme Court, the defendant would be serving 240 months. The Court did sentence him to 250 months. That's an interesting issue to be considered later. Yes, Your Honor. Any additional questions? No, thank you. Thank you, Your Honor. Good morning. May it please the Court. Elizabeth Fishman also on behalf of the United States. And I'd like to address, if I may, the issue of the tax records. And in first, in response to Your Honor's question, the order was actually not served on the IRS at the time trial started. And it wasn't until the defense had raised the fact that they had not received the records that it was the government went out to try and find out what the status was, and that's when we first discovered that the Court had actually not served the order. And I don't believe that the order was ever served on the IRS, so that they never had the order to disclose those tax records. With respect to those records, really the issue is two sides of a coin. Either they would show payments by the government, which may show a motive or a bias in terms of the CI's testimony, or if he made a false statement, clearly that would be impeaching material. With respect to the first issue, there was no question that the DEA had paid the CI $500,000 in the past six years. So his motivation or bias on that front was fully brought out during trial. In addition, the CI had admitted that he earned additional amounts from the other local law enforcement agencies, which is slightly different than is presented in the defense's brief. The CI did testify. It was $500,000 total from the DEA, plus extra monies from the local law enforcement. So in terms of his motivations or bias that fully came out in trial. To the extent that they may have contained impeaching material, which the government doesn't concede, any impeachment that would have come out would not have put this case in such a different light so as to undermine confidence in the verdict. The cross-examination shows that the defense spent several hours cross-examining the CI on numerous, numerous topics. There were over 20 areas of cross-examination. This one additional area of impeachment certainly would have not destroyed the CI's credibility any more than it already was. So for that reason, the government submits that there was no Brady error and no confrontation clause error. With respect to the jurisdiction. But if we were to find the error, what's your argument at that point? In terms of the confrontation clause, then there's a harmless error review. So then the court can look at if that information further came out at trial, does the court believe that the outcome would be different? And in this case, the government would submit that it wouldn't be. That even if the court were to take out the confidential informant's testimony, that there was still plenty of evidence from the Riverside detective that the defendant had come in, had tested the cocaine, had marked it, and there was the recording between the CI and the defendant in which the CI negotiated for up to 50 kilograms of cocaine and, in fact, mentioned that he was going to be coming back from Canada to take 50 more. So between those two pieces of evidence, there's sufficient evidence that the defendant did commit the crime charged and found by the jury. With respect to the jurisdiction argument, I think the law is clear that the defendant and when the defendant, like he did in this case, committed all the acts sufficient to support the conviction while he was here in the Central District of California in Riverside, that this Court does have jurisdiction. And so, therefore, that argument should, excuse me, the Court should not reverse the district court on that jurisdiction. And unless the Court has any further questions, the government would submit. Thank you, counsel. Thank you. With respect to the outrageous conduct issue, I hope I'm not beating a dead horse. But if you look at pages 47 and 48 of the excerpts of record, that is Mr. Palacios' plea agreement. There is an admission that the government was party to that there was $240,000 that was involved in the transaction. And by the time it got to the government, according to the government agent, it was $179,000. So that's quite a discrepancy in monetary amount. Other than that, I have nothing further, unless the Court has any more questions. Thank you, counsel. Thank you. The case just argued will be submitted. The Court will take a brief recess. All rise.
judges: Reinhardt, Hall, Wardlaw